DECISION AND JUDGMENT ENTRY
This is an appeal from a judgment of the Lucas County Court of Common Pleas, in which the court granted summary judgment to appellees in an action to collect a debt and dismissed appellant's counterclaim for damages. For the reasons that follow, we affirm the judgment of the trial court.
On appeal appellants, Theodore Piel, Anna Piel, and Toledo Cut Stone, Inc., set forth the following assignment of error:
 "I. THE TRIAL COURT ABUSED ITS DISCRETION IN GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT BECAUSE, WHEN CONSTRUING THE EVIDENCE MOST STRONGLY IN FAVOR OF THE APPELLANTS, REASONABLE MINDS CAN DIFFER AS TO THE MEANING OF THE TERMS OF THE RELEASE."
The undisputed facts that are relevant to the issues raised on appeal are as follows. Appellee, Toledo Cut Stone ("Cut Stone"), was originally formed in 1894 to engage in the business of milling and marketing natural cut stone. In the late 1980s appellees, Arland Krueger[1] and Robert Kohler, the owners of Cut Stone, began looking for a buyer for the business so they could retire. In 1987, the business was listed for sale with Krueger's cousin, appellant Theodore Piel, a retired engineering executive turned real estate dealer. When his efforts to secure a buyer for Cut Stone failed, Piel approached Krueger and Kohler with a plan to buy the business himself.
On August 2, 1998, Theodore Piel and his wife, Anna Piel, entered into an agreement to purchase Cut Stone from Krueger and Kohler. The agreement was structured so that a new company, eventually named Toledo Cut Stone, Inc. ("TCS"), was formed by Piel to purchase all of Cut Stone's assets and take over the business. The agreement further stated that for one year from the date of closing, Krueger and Kohler would work for TCS. During that time, Krueger was to serve as TCS's president while teaching Theodore Piel the marketing side of the business, and Kohler was to serve as TCS's secretary/treasurer while teaching Piel the "shop" and the "office" sides of the business. Thereafter, Krueger and Kohler were to act as consultants to TCS, on an as-needed basis. The parties originally contemplated that appellant, Theodore Piel, and his son, Kendal Piel, would completely take over TCS and run it themselves within one to five years.
To accomplish the sale of Cut Stone to TCS, the parties agreed to a leveraged buy out, with the purchase price almost completely financed by three separate promissory notes. The first note, in the amount of $167,000, was given by TCS to appellants Kohler and Krueger, in exchange for a covenant not to compete ("non-compete note"). Pursuant to the parties' agreement, payments on the non-compete note were to be made "subject to sufficient cash flow" of TCS.
A second note, in the amount of $158,429.35, was given by TCS to Cut Stone in exchange for all of the personal property and equipment formerly owned by Cut Stone ("equipment note"). The equipment note was eventually assigned to appellee South Equipment Company ("SEC"), which is wholly owned by Krueger and Kohler. The agreement stated that payments on the equipment note were to made in equal monthly installments over a five year period.
A third note, in the amount of $122,000, was given in connection with the exchange of certain real estate between the Piels and Cut Stone, and is not at issue in this appeal. In addition to the above, the agreement stated that Krueger, Kohler and Theodore Piel each were to receive one hundred shares of stock in TCS. Theodore Piel was given the right to purchase the two hundred shares held by Krueger and Kohler for the sum of $120,000 when the purchase of Cut Stone was completed.
For several years after TCS was purchased by Piel, sales and profits increased. During that time, Kohler was responsible for paying all of the company's bills, which including making payments on the non-compete note and the equipment note. However, beginning in 1992, as the Piels began to take over TCS, its sales and profits began to decline. As a result, Kohler began delaying payments to certain key suppliers of natural stone, who then refused to extend credit to TCS. Consequently, TCS was prevented from bidding on the jobs it needed to continue producing a cash flow. In spite of TCS's steadily declining income, Kohler continued to make payments on the equipment and non-compete notes. By December 1993, the total of principal and interest payments made to SEC on the equipment note was $147,222.35, and the payments made to Krueger and Kohler on the non-compete note totaled $138,962.
Krueger retired from TCS in 1993. Kohler abruptly tendered his resignation and retired to Florida in 1994. Both men continued as shareholders of the TCS until October 14, 1996.
After Kohler left TCS in 1994, the Piels inspected the company's records for the first time. Thereafter, they accused Krueger and Kohler of mismanaging the business by making payments to themselves on the non-compete and equipment notes while, at the same time, neglecting to make timely payments to TCS's trade creditors. In return, Krueger and Kohler began to press the Piels for the remaining payments due on the non-compete and equipment notes.
Between March 1994 and October 1996, attorneys for all the parties exchanged correspondence and engaged in extensive negotiations in an attempt to resolve their respective claims. On October 14, 1996, the parties executed a "Release of All Claims" ("Release"). Pursuant to the terms of the Release, Krueger and Kohler gave all of their stock in TCS to Theodore Piel, in exchange for a release of all claims made by appellants "on account of or in any way arising out of the purchase * * * * of the assets of [TCS]."
On February 26, 1998, appellees filed the complaint herein for judgment against the Piels and TCS in the amounts of $35,613.60 in unpaid principal and interest on the non-compete note, and $64,170.18 in unpaid principal and interest on the equipment note. Thereafter, the Piels and TCS filed an answer and counterclaim for damages, in which they alleged breach of contract, breach of fiduciary duty and fraud by Krueger and Kohler.
On April 26, 1999, appellees filed a motion for summary judgment, in which they asserted that they are entitled to payment of principal and interest on the equipment and non-compete notes as a matter of law. In addition, appellees asserted that, as a matter of law, the Release executed by the parties on October 14, 1996, operates as a complete bar to appellants' counterclaim for damages.
On May 6, 1999, appellants filed a memorandum in opposition to summary judgment, in which they asserted that their counterclaim is not barred by the Release. In support thereof, appellants state that the Release covers only those claims "arising out of the purchase" of TCS, and that those transactions, "at the latest, were completed by the summer of 1989." On May 13, 1999, appellees filed a reply, in which they argued that the scope of the Release cannot possibly be limited to actions that occurred in 1988 and 1989, because "the very notes which [appellees] allegedly paid wrongfully, were the same notes given in connection with the initial purchase [of TCS]."
On May 24, 1999, the trial court filed a judgment entry in which it found that the execution of the two notes and the continued involvement of Krueger and Kohler in the management of TCS were essential elements of the purchase contract. The court further found that appellants' counterclaim that Krueger and Kohler mismanaged TCS is directly related to the payment of the notes and, therefore, Krueger's and Kohler's involvement in TCS from 1988 until 1994 "certainly qualifies as events that `arose out of the purchase.'"
Ultimately, the trial court found that appellants' counterclaim was barred by the Release, and that appellants were not absolved of their obligation to pay appellees the balance due on the two notes. Accordingly, the court granted summary judgment to appellees on their claims for payment of the equipment and non-compete notes, and dismissed appellants' counterclaim for damages. On June 18, 1999, a timely notice of appeal was filed.
In their sole assignment of error, appellants assert that the trial court erroneously found that their counterclaim is barred by the release. In support thereof, appellants argue that "[a]n examination of the language of the release makes it clear that the parties released only claims arising out of the purchase
of TCS, not claims arising from the management of TCS." (Emphasis original.) Appellants further argue that the language used in the Release is unambiguous, and that the phrase "arising out of the purchase" refers only to appellees' behavior "prior to, concurrent with and up to one year after the sale."
We note initially that, in reviewing a summary judgment, this court must apply the same standard as the trial court.Lorain Natl. Bank v. Saratoga Apts. (1989), 61 Ohio App.3d 127,129. Summary judgment will be granted when there remains no genuine issue of material fact and, when construing the evidence most strongly in favor of the non-moving party, reasonable minds can only conclude that the moving party is entitled to judgment as a matter of law. Civ.R. 56(C).
A release is defined generally as:
 "`the giving up or abandoning of a claim or right to the person against whom the claim exists or against whom the right is to be enforced or exercised. Stated in basic terms, it is a contract * * *.'" Wyckoff v. Lightning Rod Mutual Ins. Co. (Dec. 8, 1995), Lucas App. No. L-95-128, unreported, quoting Fabrizio v. Hendricks (1995), 100 Ohio App.3d 352, 356; 15 O. Jur.3d, Compromise, Accord and Release § 1.
The overriding consideration in interpreting a release is ascertaining the intent of the parties. See Whitt v. Hutchison
(1975), 43 Ohio St.2d 53, 59, citing Adams Express Co. v. Beckwith
(1919), 100 Ohio St. 348, 357. Ohio courts presume that the intent of the parties lies in the language they chose to employ in the agreement. Shifrin v. Forest City Ent., Inc. (1992), 64 Ohio St.3d 635,638, citing Kelly v. Med. Life Ins. Co. (1987), 31 Ohio St.3d 130, at paragraph one of the syllabus.
The construction of written contracts is a matter of law and courts will give common words in a written instrument their plain and ordinary meaning, unless an absurd result would follow or there is clear evidence of another meaning from the face or overall contents of the instrument. Alexander v. BuckeyePipe Line Co. (1978) 53 Ohio St.2d 241, at paragraphs one and two of the syllabus. Only if the meaning of a contract term cannot be determined from the four corners of the contract, will a factual determination of intent be necessary to supply the missing term.Kelly, supra, at 132; Inland Refuse Transfer Co. v.Browning-Ferris Indus. of Ohio, Inc. (1984), 15 Ohio St.3d 321,322.
In this case, the release executed by the parties on October 14, 1996, states, in relevant part:
 "The undersigned Theodore F. Piel, Ana Lou Piel, Kendal A. Piel and Deborah Ann Piel, individually and jointly and severally, for and in consideration of the sum of one and 00/Dollars ($1.00), and the assignment of the common stock of Robert D. Kohler and Arland R. Krueger in the Toledo Cut Stone, Inc., the receipt whereof is hereby acknowledged, do hereby and for their heirs, executors, administrators and assigns release, acquit and forever discharge Robert D. Kohler, Arland R. Krueger, Toledo Cut Stone Company and South Equipment Company, their heirs, successors and assigns, from any and all claims, actions, causes of action, demands, rights, damages, costs, expenses and compensation whatsoever, which the undersigned now have or which they may hereafter accrue on account of or in any way arising out of the purchase by Theodore F. Piel of the assets of Toledo Cut Stone Company and/or South Equipment Company. * * *
 "The undersigned further declare and represent that no promise, inducement or agreement now herein expressed has been made to them and that this release contains the entire agreement between the parties hereto, that the terms of this release are contractual and not mere recital, and that there is no intent by any of the above mentioned parties, that any claims against the undersigned are hereby released."
The Release set forth above clearly states that Krueger and Kohler are released from all claims which may have accrued "on account of or in any way arising out of the purchase" of TCS. The parties agree that the Release covers all actions by Krueger and Kohler that occurred in the first year following the execution of the purchase agreement. However, appellants argue that their counterclaim is not barred in this case because the Release cannot be interpreted to mean that Krueger and Kohler are released from claims that they mismanaged TCS between 1989 and 1994. The relevant questions, then, to be decided by this court is whether or not the parties intended to limit the Release to only those claims which "arose" out of the purchase of TCS in the first year after the purchase agreement was signed.
We note initially that the equipment note and the non-compete note were given as part of the purchase price for TCS, and that payments were still being made on the two notes for up to five years after the purchase agreement was signed. It is undisputed that Kohler's and Krueger's long-term involvement in TCS was contemplated in the purchase agreement.
Second, it was in 1994, after Kohler left TCS, that the Piels first accused Krueger and Kohler of mismanaging the business and making payments to themselves on the two notes in spite of the company's poor financial condition. The record further shows that, between Kohler's departure in 1994 and execution of the Release in 1996, a series of letters was exchanged between the parties' attorneys. In those letters, claims were made against Kohler and Krueger that are identical to those raised in appellants' counterclaim.
Finally, as set forth above, on October 14, 1996, the Release was executed. At that time, Krueger and Kohler agreed to surrender their two hundred shares in TCS, in exchange for a release from any and all claims which "may hereafter accrue on account of or in any way arising out of the purchase [of TCS]."
This court has reviewed the entire record of proceedings before the trial court and, upon consideration thereof and the law, finds that the counterclaim brought by appellants against appellees clearly involves claims that "arose" out of the purchase agreement. Further, under the circumstances of this case, the phrase "in any way arising out of the purchase [of TCS]" cannot reasonably be construed to mean that Krueger and Kohler were released only from claims arising from their behavior "prior to, concurrent with and up to one year after the sale." Accordingly, the trial court did not err by finding that appellants' counterclaim against Krueger and Kohler is barred by the terms of the Release and ordering appellants to pay appellees the remaining principal due on the non-compete and equipment notes, plus interest. Appellants' assignment of error is found not well-taken.
There remains no other genuine issue of material fact and, when construing the evidence that was before the trial court most strongly in favor of appellants, reasonable minds can only conclude that appellees are entitled to summary judgment as a matter of law. The judgment of the Lucas County Court of Common Pleas is hereby affirmed. Court costs of these proceedings are assessed to appellants.
JUDGMENT AFFIRMED.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
MELVIN L. RESNICK, J., RICHARD W. KNEPPER, P.J., and MARK L. PIETRYKOWSKI, J., concur.
[1] On January 13, 2000, counsel for appellees filed a "SUGGESTION OF DEATH" notice in this court, in which he stated that Arland Krueger died on December 26, 1999.